

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Zachary A. Myers
Assistant United States Attorney
Zachary.Myers @usdoj.gov

*ℋ.ℬ.ℬ. s.s.s./*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4848
MAIN: 410-209-4800
FAX: 410-962-0716

April 13, 2021

Nate Smith, Esq.
Brendan Hurson, Esq.
Assistant Federal Public Defenders
100 S. Charles Street
Tower II, Floor 9
Baltimore, Maryland 21201

Re:   United States v. Jordan K. Milleson, Criminal No. JKB-20-195

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Jordan K. Milleson (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **April 16, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty to Count Thirteen of the Superseding Indictment, which charges him with Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. The Defendant admits that he is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Superseding Indictment, in the District of Maryland,

   a.   The Defendant knowingly transferred, possessed, or used;
   b.   Without lawful authority;
   c.   Means of identification of another person;
   d.   During and in relation to a felony enumerated in 18 U.S.C. § 1028A(c), specifically, Wire Fraud in violation of 18 U.S.C. § 1343.

Penalties

3.      The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| CT. | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 13 | 18 U.S.C. § 1028A | 2 years | 2 years | 1 year | $250,000 | $100 |

        a.      **Prison:** If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

        b.      **Supervised Release:** If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

        c.      **Restitution:** The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, 3664, and 1593. The parties stipulate and agree that the mandatory restitution provisions of 18 U.S.C. § 3663A apply, and that restitution should be ordered to the victims as follows, in addition to restitution to Individual Victim 6, to be determined at or before sentencing (without precluding any victim from filing an additional claim for restitution as authorized by statute):

| VICTIM | RESTITUTION |
|---|---|
| Individual Victim 3 | $16,847.47 |
| Individual Victim 5 | $2,182.01 |
| Individual Victim 6 | $3,000 |
| Individual Victim 7 | $12,300 |

The parties further stipulate and agree that 0.1995824 Bitcoin Seized from an Exodus software wallet owned by the defendant on July 29, 2020, will be applied towards the defendant's restitution obligations:

        b.      **Payment:** If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

        c.      **Collection of Debts:** If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant

Page 2 of 7

agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the

case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.        If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.        By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.        The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.        This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agrees that the applicable guidelines are as follows:

a.        **Advisory Sentence:** Pursuant to U.S.S.G. § 2B1.6, the guideline sentence is the two-year term of imprisonment required by statute. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply.

7.        There is no agreement as to the Defendant's criminal history.

8.        Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.      At the time of sentencing, this Office and the Defendant will jointly recommend a sentence of two years' imprisonment, followed by 1 year of supervised release. This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of the Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

10.     At or prior to sentencing, the Defendant agrees to execute necessary documents to abandon the following property to the United States:

   a.  Acer Nitro laptop, Serial Number: NHQ3YAA001910023DA3400

   b.  iPhone mobile phone, IMEI: 014736000050610

   c.  iPhone mobile phone, IMEI: 355695077753471

   d.  iPhone mobile phone, IMEI: 358684091489210

   e.  iPhone mobile phone, IMEI: 35726909325985

   f.  1 Trezor hardware wallet

   g.  Miscellaneous SIM Cards

   h.  0.1995824 Bitcoin Seized from an Exodus software wallet

## Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute.

   b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      (i)      The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

(ii)     This Office reserves the right to appeal any sentence below a statutory minimum.

c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Defendant's Conduct Prior to Sentencing and Breach

12.     a.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

b.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein.

## Court Not a Party

13.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

14.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements,

promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

By: _____
Zachary A. Myers
Christopher M. Rigali
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

04/23/2021
_____
Date

Jordan K. Milleson

We are the Defendant's attorneys. We have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises us that the Defendant understands and accepts its terms. To our knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

04/28/2021
_____
Date

_____
Nate Smith, Esq.
Brendan Hurson, Esq.

**ATTACHMENT A**
**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Since at least September 23, 2017, the defendant, Jordan K. Milleson of Maryland, has been a computer "hacker," who accessed various computers, computer networks, and electronic accounts without authorization, which allowed him to carry out and further various criminal offenses and schemes.

One component of Milleson's online criminal activities has been obtaining through deceitful means the credentials of others, which has allowed him to access and steal things of value, such as cryptocurrency and social media accounts. To do this, Milleson set up internet domains and fraudulent websites, designed to appear to be legitimate websites (including the websites of wireless providers), which were in fact designed to steal account credentials. Milleson used techniques such as phishing and vishing to deceive victims into visiting the fraudulent websites, where the victims would provide account credentials. For example, Milleson and his co-conspirators posed as wireless-carrier help desk technicians and called unsuspecting wireless retail store employees to induce them into turning over their network login credentials. The caller would direct the employees to a phishing website designed to look like an authentic wireless carrier internal network login page. The conspirators would steal the login credentials through the phishing websites or by tricking the employee into giving the caller remote desktop access to the mobile carrier network system.

Milleson and others used electronic account credentials stolen from employees and affiliates of wireless phone providers to access those companies' computer networks without authorization. After obtaining unauthorized access to the computer networks of wireless providers, Milleson and others executed SIM swapping attacks against customers of the wireless providers, most of whom were specifically targeted as holders of cryptocurrency, enabling him and co-conspirators to take control over the customers' wireless accounts. Once in control of these customers' wireless accounts, Milleson and others used account security features linked to these compromised mobile phone numbers to take over the mobile phone customer's online accounts, including email and digital currency accounts, facilitating his and his co-conspirators' thefts of accounts and digital currency.

Between September 23, 2017, and July 29, 2020, Milleson engaged in many such schemes, including the following:

### Milleson's Phishing and Theft of Accounts Belonging to Individual Victims 1 and 6

"Individual Victim 1" was a resident of Alabama, who published content on a variety of social media platforms, including YouTube, Instagram, Snapchat, and Twitter. Individual Victim 1 had hundreds of thousands of followers across their accounts, and was able to monetize them through techniques such as sponsored links, product placements, and product reviews.

On September 23, 2017, Milleson sent a phishing email to Individual Victim 1 that appeared to be a legitimate email from Instagram. The email included a link to a fraudulent domain owned by Milleson, which was used to host a phishing website resembling a legitimate Instagram webpage. Through this website, Milleson stole Individual Victim 1's password. Milleson used this stolen password to take over Individual Victim 1's Snapchat account. Milleson changed the account's email address and password, preventing Individual Victim 1 from accessing their account, and posted material to the accounts without the user's authorization.

"Individual Victim 6" was a resident of Iowa, who published content on a variety of social media platforms, including YouTube, Instagram, and Twitter. Individual Victim 6 had hundreds of thousands of followers across their accounts, and was able to monetize them through techniques such as sponsored links, product placements, and product reviews.

On approximately September 24, 2017, Milleson used a stolen password to take over Individual Victim 6's Instagram account. Milleson changed the account's email address and password, preventing Individual Victim 6 from accessing their account, and posted material to the account without the user's authorization. At the time of the account takeover, Individual Victim 6 maintained approximately 50,000 followers on their Instagram account, and had successfully brokered "brand deals" linked to their YouTube account, as advertised through their Instagram and other social media accounts. As a result of the takeover, Individual Victim 6 lost all of their Instagram followers and was unable to advertise to them. Because of this promotional interference, Individual Victim 6 lost their "brand deals," the proceeds of which had been used to pay for college tuition, transportation, and groceries.

Login credentials and passwords belonging to Individual Victims 1 and 6 were located on Milleson's computers when they were searched pursuant to search warrants.

### Milleson's Theft of Cryptocurrency and Accounts Belonging to Individual Victims 3, 4, and 5

Individual Victim 5 worked for a cryptocurrency investment firm. On June 14, 2019, Individual Victim 5's mobile phone stopped working as a result of a SIM swapping attack against his account. That day, an unauthorized user accessed Individual Victim 5's digital currency accounts at three different exchanges. The unauthorized user successfully transferred cryptocurrency valued at a total of approximately $2,182.01 at the time from Individual Victim 5's exchange account. Milleson's electronic devices were later searched and investigators found references to Individual Victim 5 on the devices, including logs showing a successful login to Individual Victim 5's cryptocurrency account and transfer of cryptocurrency on June 14, 2019.

On June 17, 2019, Milleson registered a fraudulent internet domain with a name designed to deceive others to believe it was associated with a wireless telephone provider. The fraudulent website hosted at the domain Milleson registered was designed to steal the login credentials of legitimate users of the wireless provider's computer networks, enabling Milleson to execute SIM swapping attacks against the company's customers. Individual Victim 2 was an employee of a third-party retailer for the wireless provider, who had access to the company's computer networks.

2

On June 25, 2019, Milleson and others used the credentials of Individual Victim 2 to gain unauthorized access to the wireless provider's computer network and execute SIM swapping attacks, taking control of the wireless calls and text messages sent to the accounts of Individual Victim 3, Individual Victim 4, and Individual Victim 5.

Individual Victim 3 was the owner of a digital currency investment and social media marketing company. On June 25, 2019, Milleson and others took unauthorized control of Individual Victim 3's account with a digital currency exchange and fraudulently transferred digital currency, valued at approximately $16,847.47 at the time, from Individual Victim 3's account. During the SIM swapping and theft of Individual Victim 3's digital currency, Milleson and his co-conspirators communicated about their actions in real-time using electronic messaging applications. The messages showed that the co-conspirators divided up tasks during the offenses, for example, others held wireless devices used to intercept two-factor authentication codes sent to Individual Victim 3's wireless number. Milleson was responsible for using compromised credentials to access Individual Victim 3's digital currency account and make fraudulent transfers to accounts Milleson controlled.

Individual Victim 4 had an Instagram account with a two-character username, coveted by other social media users for its uniqueness and simplicity. On or about June 25, 2019, Milleson took unauthorized control of Individual Victim 4's Instagram account.

## Milleson is "Swatted" by his Co-Conspirators

On June 26, 2019, the Baltimore County Police Department ("BCoPD") received a call from an unknown male subject claiming that he allegedly shot his father and was threatening to shoot himself. The male caller stated he was at Milleson's home address and advised he was still armed with a handgun. During the call, the unknown male subject refused and threatened to shoot police if confronted.

The BCoPD dispatched patrol officers to respond to Milleson's address and established a command post in preparation for a barricade situation. Officers subsequently learned, however, that there was no true emergency situation at the Milleson residence.

Officers interviewed Milleson's father, who informed officers he believed he and his family were victims of a "swatting" incident. "Swatting" refers to a criminal harassment tactic whereby a person places a false call to emergency services such as a bomb threat or hostage situation to trigger a police force and/or a special weapons and tactics ("SWAT") team response to a specific address—thereby causing a life-threatening situation. Milleson's father reported that just prior to the police contact, they received a phone call from an unknown person who told Milleson's father that Milleson stole $20,000 from him. The caller also told him that Milleson was a hacker that went by the alias "Chikri." According to Milleson's father, Milleson grew concerned when he learned of the impending police response, and attempted to conduct a factory reset of the operating system on the family's personal computer in an effort to wipe the device.

Investigators seized digital devices from Milleson, including computers and mobile devices, and later searched them pursuant to search warrants. Investigators located evidence on Milleson's devices showing they were used in the course of SIM swapping and hacking offenses, including the theft of accounts and cryptocurrency from Individual Victims 1-6. Milleson later admitted that he believed he was "swatted" by his co-conspirators because he initially failed to share the money that had been stolen from Individual Victim 3.

## Milleson's Theft of Cryptocurrency from Individual Victim 7

On January 25, 2020, Individual Victim 7's mobile phone stopped working as a result of a SIM swapping attack. Soon thereafter, Individual Victim 7's personal email password was reset without authorization. An unauthorized user then accessed Individual Victim 7's account on a digital currency exchange and stole various digital currencies worth approximately $12,300 at the time.

## The Arrest of Milleson and Recovery of Additional Evidence

Following his indictment, Milleson's home was searched on July 29, 2020. In the course of the search, law enforcement officers recovered mobile devices from Milleson's residence that had been paired with several different wireless phone numbers, including that of Individual Victim 7. Review of the devices seized from Milleson showed that they were used to complete two-factor authentication password resets for several electronic and digital currency accounts, including Individual Victim 7's digital currency exchange account.

Investigators also recovered chats between Milleson and his co-conspirators evidencing their unlawful schemes. In connection with the cryptocurrency theft from Individual Victim 3, for example, investigators found online chats between Milleson, using an anonymous screenname, and two co-conspirators, one of whom used the name, "cccccc#2222" (Co-Conspirator 1). In these chats, Milleson would ask Co-Conspirator 1 for "codes," which were two-factor authentication codes being sent to a device held by Co-Conspirator 1. After Milleson and the Co-Conspirators gained access to Individual Victim 3's cryptocurrency exchange account, Milleson wrote, "16k." Co-Conspirator 1 responded, "transfer… through coinbase." The other co-conspirator then wrote, "how long is it gna take jordy," and "so the 16k going to Jordy coimbase [sic]." After Milleson failed to respond to his co-conspirators, Co-Conspirator 1 wrote, among other things, "you better hope no one has info on you." Co-Conspirator 1 also asked others if they had Chikri's "dox," meaning information about his true identity. Later, Co-Conspirator 1 wrote about the deal that Milleson ("Jordy") "snaked him" despite Co-Conspirator 1 walking Milleson through the theft and "help[ing] [Milleson] clean it."

Milleson was interviewed and admitted to taking part in numerous SIM swaps and cryptocurrency thefts, which he believed aggregated to approximately $200,000 worth of stolen cryptocurrency, an amount investigators have been unable to confirm. Milleson admitted his role in the theft of cryptocurrency from Individual Victim 3, as well as the theft of Individual Victim 1's Snapchat account.

SO STIPULATED:

Zachary A. Myers
Christopher M. Rigali
Assistant United States Attorneys

Jordan K. Milleson
Defendant

Nate Smith, Esq.
Brendan Hurson, Esq.
Counsel for Defendant

5